AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Minor Adermi Peralta-Perez,  a/k/a Jose Mejia Lara, | ) | Case No. |
| a/k/a Amilcar Lara and | ) | |
| Mynor Alexander Mejia Benitez a/k/a Mynor | ) | 18-MJ-393 -O1 |
| Alexander Mejia | ) | (M-18-2662-M) |
| | ) | |
| _____ | ) | |
| Defendant(s) | | |

AUG 1 5 2018

... COURT
...RGINIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June 2017 through August 14, 2018___ in the county of _____Prince William_____ in the

____Eastern____ District of _____Virginia_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) and 846 | Conspiracy to Distribute 500 grams or more of Cocaine |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

Task Force Officer Richard O'Donnell, DEA
Printed name and title

Sworn to before me and signed in my presence.

Date: ___8/15/18___

/s/ ____
Michael S. Nachmanoff
United States Magistrate Judge
Judge's signature

City and state: _____Alexandria, Virginia_____

Hon. Michael S. Nachmanoff, Magistrate Judge
Printed name and title

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

AUG 1 5 2018

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA )
)
v. )
)
MYNOR ALEXANDER MEJIA BENITEZ )
a/k/a/ ) Criminal No. 1:18-MJ-393
"MYNOR ALEXANDER MEJIA" )
"MYNOR ALEXANDER MEJIA-BENITEZ," ) (M-18-2662-M)
)
and )
)
MINOR ADERMI PERALTA-PEREZ )
a/k/a/ )
"JOSE MEJIA LARA" )
"AMILCAR LARA," )
)
Defendants. )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Richard G. O'Donnell, Task Force Officer of the Drug Enforcement Administration
(DEA), Washington Division Office (WDO), Washington, D.C., being duly sworn, depose
and state the following:

INTRODUCTION

1.     I am "an investigative or law enforcement officer" of the United States within

the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United

States who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18, United States Code. I have been a State Police

Trooper/Narcotics Agent with the Virginia State Police for approximately 11 years and have

spent the last six years as a Special Agent assigned to the Virginia State Police Bureau of

Criminal Investigations Narcotics Section. On April 12, 2017, I was federally deputized as a

Task Force Officer with the Drug Enforcement Administration's Washington Division Office

and have been assigned to the High Intensity Drug Trafficking Area Northern Virginia Drug

Initiative for over one year.

2.      During my time in law enforcement, I have participated in the application for

and execution of numerous arrest and search warrants in the investigation of narcotics and

organized crime related offenses, resulting in the prosecution and conviction of numerous

individuals and the seizure of illegal drugs, drug proceeds in the form of bulk U.S. currency,

weapons, and other evidence of criminal activity. As a narcotics investigator, I have

interviewed many individuals involved in drug trafficking and have obtained information

from them regarding the acquisition, sale, importation, manufacture, and distribution of

controlled substances. Through my training and experience, I am familiar with the methods

used by traffickers of controlled substances and the nature and appearance of illegal narcotics.

I have received extensive training in drug identification, drug distribution methods, and drug

enforcement techniques from various federal, state, and local agencies.

3.      Based upon this experience, I have become knowledgeable of the methods and

modes of narcotics operations, and the language and patterns of drug abuse and trafficking.

During the course of my participation in investigations of narcotics trafficking organizations, I

have testified in trial, grand jury proceedings, and at preliminary hearings. Through my

employment with the Virginia States Police and tenure with the DEA as a task force officer, I

have gained knowledge in the use of various investigative techniques, including the use of

wiretaps, physical surveillance, undercover agents, confidential informants, cooperating

2

witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually

monitored recordings, investigative interviews, financial investigations, the service of

administrative and grand jury subpoenas, and the execution of search and arrest warrants.

4.      This affidavit is made in support of a criminal complaint charging MYNOR

ALEXANDER MEJIA BENITEZ, a/k/a "Mynor Alexander Mejia" (herein MEJIA

BENITEZ), and MINOR ADERMI PERALTA-PEREZ (herein after PERALTA-PEREZ),

a/k/a "Amilcar Lara," a/k/a "Jose Mejia Lara," with distribution of five-hundred (500) grams

or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II

controlled substance, in violation of Title 21, United States Code, sections 841(a)(1) and 846.

5.      The information contained in the affidavit is not intended to include each and every

fact and matter observed by me or known to the United States.  The facts and information

contained in this affidavit are based upon my personal knowledge and information obtained

from other law enforcement officers and witnesses.  All observations referenced in this

affidavit that were not made by me were relayed to me by the person who made such

observation. This affidavit contains information necessary to support probable cause for this

application.

STATEMENT OF PROBABLE CAUSE

*Cooperating Sources*

6.      Law enforcement officers used two cooperating sources (hereinafter "CS-1"

and "CS-2") during this investigation. For the purposes of this affidavit, the confidential

sources will be referred to in the masculine, regardless of actual gender.  CS-1 has provided

information which has proven to be truthful and against his own penal interests, and which, to

the extent possible, has been corroborated through various investigative techniques, to include

3

analysis of telephone toll records, recorded conversations, and various surveillance

techniques. CS-1 is a regular-use paid confidential source and has been proven and deemed

to be reliable by law enforcement officer's independent investigative means. Information

provided by CS-1 has been verified whenever possible by multiple independent resources, as

well as by me, and was found to be truthful. CS-1 has had a relationship with the Arlington

County Police Organized Crime Unit since 2013 and since then, CS-1 has provided

information that has led to the arrests of individuals and the seizures of money and illegal

narcotics. CS-1 has also worked with the DEA and Fairfax County Police, and the

information provided led to the arrest of individuals and the seizures of money and illegal

narcotics. CS-1 has a criminal record, which consists of felony hit and run, felony destruction

of property, felony assault on law enforcement in 2011, and a misdemeanor reckless driving

conviction in 2017. Additionally, CS-1 is gainfully employed. The information provided by

CS-1, has never been found to be false or misleading. For these reasons, I consider CS-1 to

be reliable.

    7.      CS-2 has provided information to the Arlington County Police Department,

which has been proven to be truthful and against his own penal interests, and which, to the

extent possible, has been corroborated through various investigative techniques, including

analysis of telephone toll records, recorded conversations, and various surveillance

techniques. CS-2 has been proven reliable and deemed to be reliable by Detectives with the

Arlington County Police Department. CS-2 has had a relationship with the Arlington County

Police Department's Organized Crime Unit since 2017. While CS-2 was being used by law

enforcement, he was gainfully employed and had no felony convictions or crimes of moral

turpitude on his criminal history. On October 7, 2017, CS-2 was arrested by the Arlington

4

Police Department for Felonious Malicious/Unlawful Wounding. Once members of the Arlington County Police Department's Organized Crime Unit discovered this information, CS-2 was immediately deactivated as a confidential source and has not been used in any facet of this investigation since then.

*Background of the Investigation*

8.      In June of 2017, Arlington County Police (ACPD) Detectives began an investigation into a cocaine source of supply that was distributing quantities of cocaine in Arlington, Virginia, within the Eastern District of Virginia. CS-1 identified a Hispanic male known to him as "Minor," as the main source of supply of cocaine in the investigation. Additionally, CS-1 said "Minor" was selling ounce quantities of cocaine and was using the cellular telephone number, 571-245-2489, to facilitate his illegal narcotics enterprise.

9.      A query of law enforcement databases and social media websites were made into the phone number used by "Minor." The results of the queries identified "Minor" as possibly being Jose MEJIA LARA, a.k.a. Amilcar LARA. It should be known that Jose MEJIA LARA was later identified as Minor Adermi PERALTA-PEREZ (herein after referred to as PERALTA-PEREZ). PERALTA-PEREZ, a.k.a. Jose MEJIA LARA, a.k.a Amilcar LARA was described as a white Hispanic male with a date of birth of August 28, 1974. CS-1 was shown a non-descript photograph of PERALTA-PEREZ, a.k.a. MEJIA LARA, which was located on a publically accessible social media website, and CS-1 positively identified that pictured subject as the person he knew to be "Minor," and the subject he knew to be selling cocaine.

*CS-1 Purchase of Cocaine from Peralta-Perez on June 30, 2017*

10.     On June 30, 2017, ACPD Detectives conducted a controlled purchase using
CS-1 in Arlington, Virginia within the Eastern District of Virginia.  Under the direction of law
enforcement, CS-1 had previously arranged to purchase 3.5 grams of cocaine from
PERALTA-PEREZ.  Prior to the meet, CS-1's person and vehicle were searched and found to
be free of money and contraband.  CS-1 was then given $200 in pre-recorded Arlington
County evidentiary funds for the purchase of cocaine.  CS-1 was followed to a predetermined
meeting location, where he would wait for PERALTA-PEREZ.  A brief time later,
PERALTA-PEREZ was observed arriving in a black Lincoln Navigator bearing a Virginia
registration of VXJ-6844.  CS-1 entered the black Navigator and a short time later,
PERALTA-PEREZ was observed exiting the vehicle and going to the rear cargo area of the
vehicle to retrieve an item, after which he then immediately returned to the front driver's seat.
CS-1 exited the vehicle and parted ways with PERALTA-PEREZ.  CS-1 was then followed
by law enforcement to an undisclosed location where he immediately relinquished
approximately 3.5 grams of suspected cocaine to law enforcement.  CS-1 said that
PERALTA-PEREZ went to the rear of his vehicle to retrieve the cocaine and said that he
observed more cocaine in the vehicle.  CS-1's person and vehicle were searched again and
found to be free of money and contraband.  A small portion of the suspected cocaine was field
tested by ACPS Detectives and the results were positive for the presence of cocaine
hydrochloride.

*CS-2 Purchase of Cocaine from Peralta-Perez on July 28, 2017*

11.     On July 28, 2017, at the direction of ACPD Detectives, CS-2 conducted a
controlled purchase of 3.5 grams of cocaine from an unindicted co-conspirator (herein

6

referred to as UCC-1 and in the masculine regardless of gender), in Arlington, Virginia.
Before the encounter, CS-2 and his vehicle were searched and found to be free of money and
contraband. CS-2 was provided with $225 in pre-recorded Arlington County evidentiary
funds. CS-2 advised law enforcement that UCC-1 was currently out of cocaine but that UCC-
1 contacted PERALTA-PEREZ to purchase the desired amount of cocaine for CS-2. CS-2
was followed by law enforcement as he met with UCC-1 at a location in Arlington, Virginia.
During the meeting, CS-2 fronted the pre-recorded evidentiary purchase funds to UCC-1.
UCC-1 left their location and was followed with unbroken surveillance by law enforcement to
another location in Arlington, Virginia to meet with PERALTA-PEREZ.

12.     Law enforcement was simultaneously conducting surveillance on PERALTA-
PEREZ, who at the time was a passenger in a black Lincoln Navigator, bearing Virginia
registration of VXJ-6844, which was being operated by another unindicted co-conspirator
(herein referred to as UCC-2 and in the masculine regardless of gender). Law enforcement
observed UCC-1 meet with PERALTA-PEREZ and UCC-2 at a second location in Arlington,
Virginia. UCC-1 was observed getting into the black Navigator with PERALTA-PEREZ and
UCC-2. While PERALTA-PEREZ, UCC-1, and UCC-2 met, law enforcement maintained
surveillance on the vehicle until UCC-1 exited.

13.     After exiting the vehicle, UCC-1 contacted CS-2 to arrange the pick-up of the
desired cocaine. Law enforcement continued surveillance on UCC-1 until he met with CS-2
in Arlington, Virginia. UCC-1 provided CS-2 with the suspected cocaine, which was
purchased from PERALTA-PEREZ. After parting ways with UCC-1, CS-2 was followed to
an undisclosed location where he immediately provided law enforcement with approximately
3.5 grams of suspected cocaine and $25 in unspent pre-recorded evidentiary purchase funds.

CS-2 and his vehicle were searched again and was found to be free of money and contraband. A small portion of the suspected cocaine was field tested by ACPD Detectives and the results were positive for the presence of cocaine hydrochloride.

14.     On July 28, 2017, after the controlled purchase with CS-2, CS-1 contacted PERALTA-PEREZ and placed an order for a larger amount of cocaine. PERALTA-PEREZ said that he was traveling to his cocaine source's home and would pick up the requested cocaine for him. Law enforcement was able to reestablish surveillance on the black Lincoln Navigator, now being operated by PERALTA-PEREZ as it traveled south on Interstate 95 towards Woodbridge, Virginia. The Lincoln Navigator was eventually located, parked in front of the Woodbridge Residence. CS-1 informed law enforcement that they had spoken with PERALTA-PEREZ and he explained that he had reached his source of supply's residence, but would not be traveling back to Arlington until the following day. PERALTA-PEREZ said he would provide CS-1 with the cocaine at a later date.

15.     Following the surveillance of PERALTA-PEREZ at the Woodbridge Residence, an administrative subpoena for PERALTA-PEREZ's phone was served on it carrier, T-Mobile USA. A high frequency report was generated for PERALTA-PEREZ's most frequent contacts. Analysis of the frequency report identified the phone number of 571-351-7111 as being a frequent contact of PERALTA-PEREZ.

16.     Law enforcement served an administrative subpoena on 571-351-7111 requesting subscriber information. The number was shown registered to a Mynor A Mejia Benitez (herein after MEJIA BENITEZ) with an address of 1902 Fox Street Apartment 202 Adelphi, Maryland 20783. Law enforcement learned that the listed address of 1902 Fox Street Apartment 202 Adelphi, Maryland 20783 was a previous address for MEJIA

8

BENITEZ. Current law enforcement databases and public record checks listed the

Woodbridge Residence, as the current residence of MEJIA BENITEZ. This is also the

address where PERALTA-PEREZ was observed by law enforcement on July 23, 2017, when

he told the CS-1 that he was being resupplied with cocaine by his source.

*CS-1 Controlled Purchase of Cocaine from Mejia Benitez on August 31, 2017*

17.    On August 31, 2017, under the direction of law enforcement, CS-1 contacted

PERALTA-PEREZ and arranged to purchase one-half ounce of cocaine directly from

PERALTA-PEREZ's source. Prior to the deal, CS-1 met with law enforcement where his

person and vehicle were searched, and both were found to be free of money and

contraband. CS-1 was subsequently provided with $670 pre-recorded U.S. currency and

audio transmitting and recording equipment. CS-1 was followed by law enforcement as he

left an undisclosed location and drove to a predetermined meeting location where he met with

PERALTA-PEREZ. As CS-1 arrived on scene, PERALTA-PEREZ arrived operating the

black Lincoln Navigator. PERALTA-PEREZ entered CS-1's vehicle and they were followed

from the predetermined location as they traveled south on Interstate 95 towards Woodbridge,

Virginia. While in CS-1's vehicle, PERALTA-PEREZ could be heard making phone calls to

an individual believed to be his cocaine source of supply, stating that he and CS-1 were on the

way to his residence. CS-1's vehicle was followed by law enforcement to Woodbridge,

Virginia, where he was observed parking outside of the Woodbridge Residence. Both CS-1

and PERALTA-PEREZ exited the vehicle and entered the residence. A short time later, CS-1

and PERALTA-PEREZ exited the Woodbridge Residence and entered CS-1's vehicle. Law

enforcement followed the vehicle as it traveled back to Arlington, Virginia, where CS-1

dropped PERALTA-PEREZ off at his vehicle. CS-1 was then followed to an undisclosed

location where he immediately provided law enforcement with approximately a half ounce of suspected cocaine. CS-1 and his vehicle were searched again and found to be free of money and contraband. CS-1 was shown a non-descript photograph of MEJIA BENITEZ. CS-1 positively identified the subject in the picture as the individual who had just sold him cocaine inside the Woodbridge Residence. The cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and safekeeping. The laboratory results indicated that the net weight contained approximately 13.85 grams of cocaine hydrochloride.

18. After the controlled purchase, law enforcement submitted administrative subpoenas for PERALTA-PEREZ's phone and MEJIA BENITZ's phone. Toll analysis confirmed that PERALTA-PEREZ used his phone and contacted MEJIA BENITEZ several times while he and CS-1 were traveling to the Woodbridge Residence. The times of these calls were confirmed in the recording of the transaction.

*CS-1 Controlled Purchase of Cocaine from Mejia Benitez on September 14, 2017*

19. During the week of September 9, 2017, law enforcement instructed CS-1 to contact PERALTA-PEREZ to arrange a purchase of cocaine from MEJIA BENITEZ. CS-1 engaged in consensually recorded text communication with PERALTA-PEREZ, during which he arranged for a transaction of two ounces of cocaine. The text messages, which were in Spanish, were reviewed by a Spanish-speaking DEA agent. The Spanish-speaking agent provided summaries of the conversations, but not verbatim translations. The following are portions of the conversations between CS-1 and PERALTA-PEREZ during which they plan the cocaine transaction, which took place on September 7, 2017.

From: CS-1

To:   PERALTA-PEREZ

CS-1:              I want the price of the onions

CS-1:              Should we talk in person or through the telephone, you're the
                   one the knows.

PERALTA-PEREZ:  Do you want an entire onion.

CS-1:              Depends on the price.

PERALTA-PEREZ:  Do you want an entire onion.

CS-1:              Prices old man.

CS-1:              Yes, it's the stuff from the South.....

PERALTA-PEREZ:  There's no (unknown) old man, I just wanted to know if you
                   wanted the onion or the half

CS-1:              I just for the check from BMW from the accident.  I already
                   deposited it.  It's going to take 5 to 7 days to clean it self.  I'll
                   give you 2400 for 2, more or less Wednesday of Thursday.

20.     On September 14, 2017, CS-1 met with law enforcement to conduct a

controlled purchase of cocaine from MEJIA BENITEZ.  CS-1 and his vehicle were searched

and found to be free of money and contraband.  CS-1 was subsequently given $2,600 in pre-

recorded U.S. currency.  CS-1 was followed by law enforcement as he left the undisclosed

location and drove to a predetermined meeting location where he met with PERALTA-

PEREZ.  PERALTA-PEREZ then entered CS-1's vehicle, and he and CS-1 were surveilled by

law enforcement as they drove south on Interstate 95 towards Woodbridge, Virginia.  While

driving, PERALTA-PEREZ could be heard talking on the phone to an individual believed to

be his source, saying that he and CS-1 were on the way.  CS-1 was observed stopping in front

of the Larkin Drive property.  CS-1 and PERALTA-PEREZ both exited the vehicle and

11

entered the Larkin Drive property. While CS-1 and PERALTA-PEREZ were inside, law enforcement maintained surveillance on the residence. After a brief period of time, both CS-1 and PERALTA-PEREZ were observed exiting the residence and entering CS-1's vehicle. CS-1 and PERALTA-PEREZ were followed back to the pre-determined meeting location where PERALTA-PEREZ was dropped off. CS-1 was then followed back to an undisclosed location where he immediately provided law enforcement with approximately two ounces of suspected cocaine. Law enforcement searched CS-1 and his vehicle for money and contraband with negative results. CS-1 confirmed that he had purchased the cocaine directly from MEJIA BENITEZ. CS-1 also said that the Larkin Drive property appeared to be MEJIA BENITEZ's new residence. The cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and safekeeping. The laboratory results indicated that the net weight contained approximately 55.52 grams of cocaine hydrochloride.

*CS-1 Controlled Purchase of Cocaine from Mejia Benitez on October 12, 2017*

21.     On October 12, 2017, under the direction of law enforcement, CS-1 contacted PERALTA-PEREZ and arranged to purchase three ounces of cocaine. Prior to the deal, CS-1 met with law enforcement where his person and vehicle were searched and found to be free of money and contraband. CS-1 was provided with $3,900 in pre-recorded U.S. currency. CS-1 was followed by law enforcement as he picked up PERALTA-PEREZ in his vehicle. After PERALTA-PEREZ entered CS-1's vehicle, the two were surveilled by law enforcement as they drove south on Interstate 95 towards Dumfries, Virginia and the Larkin Drive property. CS-1 was observed by law enforcement parking in front of the Larkin Drive property. CS-1 and PERALTA-PEREZ were observed exiting the vehicle and entering the residence. After a short period of time, both CS-1 and PERALTA-PEREZ were observed exiting the residence and entering CS-1's vehicle. CS-1 and PERALTA-PEREZ were followed back to the pre-

determined meeting location, where PERALTA-PEREZ was dropped off. CS-1 was followed to an undisclosed location where he immediately provided law enforcement with approximately three ounces of suspected cocaine. CS-1 and his vehicle were searched again and found to be free of money and contraband. CS-1 confirmed that he had purchased the suspected cocaine directly from MEJIA BENITEZ using the pre-recorded U.S. currency. CS-1 also explained, that as in previous buys, PERALTA-PEREZ acted as a middle man and brokered the deal between CS-1 and MEJIA BENITEZ. The cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and safekeeping. The laboratory results indicated that the net weight contained approximately 83.5 grams of cocaine hydrochloride.

22.     During the week of November 5, 2017, CS-1 met with law enforcement. During this meeting, CS-1 received an unexpected phone call from PERALTA-PEREZ. During this documented conversation, CS-1 explained to law enforcement that PERALTA-PEREZ said that he and MEJIA BENITEZ had recently received high quality cocaine and were inquiring if CS-1 wanted to purchase some. PERALTA-PEREZ continued and said that he and MEJIA BENITEZ were trying to collect money so they could make another purchase of cocaine soon. Because the phone call was unexpected, law enforcement was unable to make a recording of this phone call, but the conversation was made in the presence of law enforcement.

*Surveillance of Mejia Benitez*

23.     On October 18, 2017, law enforcement established surveillance outside of the Larkin Drive property. While watching the residence, a Hispanic male wearing a white t-shirt and jeans was observed exiting the Larkin Drive property and entering a red Chevy Avalanche bearing Virginia registration VZF-6557. The Hispanic male then returned to the

13

Larkin Drive property and out of view of law enforcement. A short time later, the same

Hispanic male, and three other unidentified individuals again exited the Larkin Drive property

and entered the Chevy Avalanche again. The Hispanic male wearing the white t-shirt entered

the front passenger's seat and the vehicle exited the drive way. While following the vehicle,

law enforcement was able to positively identify the Hispanic male wearing a white t-shirt and

jeans and sitting in the front passenger seat as Mynor MEJIA BENITEZ.

24.    An inquiry with the Virginia Department of Motor Vehicles was conducted on

the red Chevy Avalanche bearing Virginia registration VZF-6557. That vehicle returned

registered to a Tiffany Abigale MARTINEZ CONSTANZA, a white Hispanic female with a

date of birth of December 22, 1993 and a listed address of 17235 Larkin Drive Dumfries,

Virginia 22026. Public source databases also show a previous address for MARTINEZ

CONSTANZA as 14702 Blair Court Woodbridge, Virginia 22193.

25.    Throughout the course of this investigation, law enforcement learned that

MEJIA BENITEZ was married to Tiffany MARTINEZ CONSTANZA. An inquiry into

publically available information on social media websites, showed that MEJIA BENITEZ and

MARTINEZ CONSTANZA identified as being married to each other and they have two

small children in common.

*CS-1 Controlled Purchase of Cocaine from Mejia Benitez on November 30, 2017*

26.    On November 30, 2017, under the direction of law enforcement, CS-1 contacted

PERALTA-PEREZ, and arranged to purchase three ounces of cocaine from MEJIA

BENITEZ. Prior to the deal, CS-1 met with law enforcement where he and his vehicle were

searched and found to be free of money and contraband. CS-1 was subsequently provided

with $3,900 in pre-recorded U.S. currency. Prior to CS-1 departing the undisclosed location,

surveillance units observed the black Lincoln Navigator, which was operated by PERALTA-

14

PEREZ, at the Larkin Drive property. Shortly after, surveillance units also observed MEJIA BENITEZ arrive at the Larkin Drive property. CS-1 was followed by law enforcement from the undisclosed location as they drove to the Larkin Drive property and entered the residence. After a brief period of time, CS-1 was observed exiting the residence and entering his vehicle. CS-1 was followed back to an undisclosed location where he immediately provided law enforcement with approximately three ounces of suspected cocaine. Law enforcement searched CS-1 and his vehicle for money and contraband, again with negative results. CS-1 confirmed that he purchased the suspected cocaine directly from MEJIA BENITEZ using the provided U.S. currency. CS-1 explained that once again, PERALTA-PEREZ brokered the deal between CS-1 and MEJIA BENITEZ. The cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and safekeeping. The laboratory results indicated that the net weight contained approximately 82.7grams of cocaine hydrochloride.

*CS-1's Communications with Peralta-Perez on December 21, 2017*

27.   On December 21, 2017, law enforcement agents instructed CS-1 to arrange a purchase of cocaine from MEJIA BENITEZ. CS-1 engaged in a consensually recorded telephone call with PERALTA-PEREZ, during which they discussed a drug transaction of six ounces of cocaine for $7,300 in U.S. currency. The conversation, which was in Spanish, was reviewed by a Spanish-speaking DEA agent. The Spanish-speaking agent provided summaries of the conversation, but not verbatim translation. The following are portions of the monitored consensually recorded telephone conversation between CS-1 and PERALTA-PEREZ during which PERALTA-PEREZ discusses the future sale of cocaine to CS-1.

From:  CS-1

To:    PERALTA-PEREZ

PERALTA-PEREZ:  Yes, let me know how many you want and soon we will get you
                a price.

CS-1:           That's what I wanted and later we will get together around there
                to have a drink over there [the Larkin Drive property]
                understand?

PERALTA-PEREZ:  No, no, tomorrow we are over around the house, where the park
                is where I live now,  So then let me call you from there because
                (inaudible)...

PERALTA-PEREZ:  Ok, come on, I'll call you after  (inaudible)

CS-1:           Oh no, then its fine then.  7400 for the six....

PERALTA-PEREZ:  That's fine old man, tomorrow we will catch up in the park, ok?

CS-1:           Ok, then we will talk when you call me in the afternoon and we
                will get together to see what's up.


*CS-1's Communications with Peralta-Perez on January 22, 2017*

28.     On January 22, 2017, at the request of law enforcement, CS-1 was instructed to

contact PERALTA-PEREZ and confirm an upcoming purchase of six ounces of cocaine from

MEJIA BENITEZ. CS-1 engaged in a consensually recorded telephone call with PERALTA-

PEREZ. The conversation, which was in Spanish, was reviewed by a Spanish-speaking DEA

agent. The Spanish-speaking agent provided summaries of the conversation, but not verbatim

translation. The following are portions of the monitored consensually recorded telephone

conversation between CS-1 and PERALTA-PEREZ during which PERALTA-PEREZ

discusses the future sale of cocaine to CS-1.

From: CS-1

To: PERALTA-PEREZ

CS-1: OK, so I am calling because there's cash for Wednesday. My money from the snow has come and give it until Wednesday to go through. I have the rest here and the rest there so for Wednesday I think we are going to pick up the six.

PERALTA-PEREZ: Ah, let me say some things to Mynor (MEJIA BENITEZ). That depends on the quantity 74.....

CS-1: I have the cash. Good whatever you want, I am going to bring the 74 and we will talk there, calm down.

PERALTA-PEREZ: 74...for each piece 1400....

CS-1: No, no, no, it's all ready. Listen to me, I am calling you to tell you that we are ready for Wednesday. Tomorrow I will send you a message only and I'll tell you tomorrow what time we will see each other there, you know that.

PERALTA-PEREZ: OK well that's fine so then I will have to start making the rounds.

CS-1: OK so them I'm calling you two days before so that you see that I am correct.

PERALTA-PEREZ: We are at Monday...Tuesday.....Wednesday. We will stick with Wednesday.

CS-1: Wednesday in the afternoon...

PERALTA-PEREZ: OK, we will close the deal at 7400.

CS-1: That's fine, let's leave it like that, 7400.

PERALTA-PEREZ: OK, so you want the 6 then?

CS-1: The 6 and on Wednesday afternoon, you know that.

PERALTA-PEREZ: Well that's fine.

*CS-1 Controlled Purchase of Cocaine from Mejia Benitez on January 24, 2018*

29.     On January 24, 2018, law enforcement agents met with CS-1 at an undisclosed located where he and his vehicle were searched and were found to be free on money and contraband. CS-1 was provided with $7,400 in pre-recorded U.S. currency for the purchase of six ounces of cocaine. Prior to leaving the undisclosed location, CS-1 made a recorded call to PERALTA-PEREZ and confirmed that the controlled purchase was planned as scheduled. CS-1 was followed by law enforcement from the undisclosed located as he drove to the Larkin Drive property. Shortly after arriving, PERALTA-PEREZ was observed arriving at the residence operating the black Lincoln Navigator. CS-1 and PERALTA-PEREZ were observed speaking with each other briefly before entering the residence together. After a brief period of time, CS-1 exited the residence and entered his vehicle. CS-1 was followed back to an undisclosed location where he immediately provided law enforcement with approximately six ounces of suspected cocaine. CS-1 and his vehicle were searched again and found to be free of money and contraband. CS-1 confirmed he had purchased the cocaine directly from MEJIA BENITEZ and that the mechanics of this purchase were the same as in previous buys. The cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and safekeeping. The laboratory results indicated that the net weight contained approximately 165.98 grams of cocaine hydrochloride.

*Traffic Stop and Identification of Peralta-Perez*

30.     On February 23, 2018, law enforcement conducted a ruse traffic stop on CS-1 to positively identify PERALTA-PEREZ. Prior to the stop, CS-1 picked up PERALTA-PEREZ at 5100 8th Road South Arlington, VA 22204. In addition to PERALTA-PEREZ, an unidentified Hispanic female believed to be his girlfriend entered the vehicle as well. At a

18

pre-determined location, the CS-1's vehicle was stopped for a traffic infraction. During the course of the traffic stop, law enforcement requested the identification of both PERALTA-PEREZ and the unidentified female.

31.     PERALTA-PEREZ provided law enforcement with a Virginia check-cashing card in the name of Jose A MEJIA LARA, with a date of birth of December 2, 1975 and a listed address of 5112 7th Road #3 Arlington, Virginia 22204. The female passenger identified herself as Yudy Marisa ABARCA with a date of birth of January 29, 1993 and provided an address of 5100 8th Road South Apartment 507 Arlington, Virginia 22204. The female passenger also identified herself as the wife of PERALTA-PEREZ. Law enforcement investigation later revealed that ABARCA's true identity as Yudy Mariza ABARCA-CORVERA, a Hispanic female with a date of birth of January 29, 1993.

*CS-1 Controlled Purchase of Cocaine from Mejia Benitez on May 7, 2018*

32.     On May 7, 2018, CS-1 met with law enforcement at an undisclosed location to conduct a controlled purchase of cocaine from MEJIA BENITEZ. CS-1 had previously contacted PERALTA-PEREZ to arrange for three ounce of cocaine, with an agreed upon price of $3,900. Several hours before the planned purchase, the CS spoke with PERALTA-PEREZ who informed him that he would not be there for the buy and that he should deal with MEJIA BENITEZ directly. CS-1 and their vehicle were search and were found to be free of money and contraband. CS-1 was provided with $3,900 in pre-recorded U.S. currency for the purchase of cocaine. Prior to leaving the undisclosed location, law enforcement had established surveillance in the area of the Larkin Drive property. Law enforcement observed MEJIA BENITEZ going in and out of the Larkin Drive property. Additionally MARTINEZ

CONSTANZA and their two children were observed going in and out of the residence as well.

33.    As CS-1 arrived at the Larkin Drive property, he exited his vehicle and approached MEJIA BENITEZ while he was outside. MEJIA BENITEZ explained to CS-1 that he was out of cocaine but was expecting a shipment later that evening. MEJIA BENITEZ explained that he could pick up an ounce of cocaine from his source now and he would contact CS-1 later that evening when the shipment came in. CS-1 agreed and was advised by MEJIA BENITEZ to wait at the Larkin Drive property while he went to get the cocaine.

34.    Surveillance units observed MARTINEZ CONSTANZA and MEJIA BENITEZ enter a silver Acura and exit the driveway with MARTINEZ CONSTANZA driving and MEJIA BENITEZ in the front passenger seat. Surveillance units followed the vehicle as it traveled north toward Dale City, Virginia, ultimately stopping in front of 4467 Dale Boulevard Woodbridge, Virginia. MEJIA BENITEZ exited the vehicle and began walking in the direction of the Dale Boulevard property. Dale Boulevard property). Due to heavy traffic in the area, surveillance units were unable to maintain constant surveillance on MEJIA BENITEZ. Several minutes later, surveillance units located MEJIA BENITEZ as he was walking away from the Dale Boulevard property and entering the waiting silver Acura. MEJIA BEINTEZ and MARTINEZ CONSTANZA were followed as they drove back to the Larkin Drive property without deviation.

35.    Shortly after MEJIA BENITEZ returned to the Larkin Drive property, CS-1 exited the residence entered his vehicle. CS-1 was followed back to an undisclosed location where he immediately provided law enforcement with approximately one ounce of suspected cocaine and the remaining unused pre-recorded U.S. Currency. CS-1 and his vehicle were

searched again and found to be free of additional money and contraband.  CS-1 confirmed

with law enforcement that the cocaine was purchased directly for MEJIA BENITEZ.  The

cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and

safekeeping.  The laboratory results indicated that the net weight contained approximately

28.12 grams of cocaine hydrochloride.

*Surveillance at 4463 Dale Boulevard Woodbridge, Virginia*

36.      During the week of June 15, 2018, law enforcement conducted surveillance on

the Dale Boulevard property.  During the observation period, law enforcement was able to

identify numerous vehicles parked in the driveway and on the street in front of the residence.

One vehicle of note was a dark-colored BMW bearing Virginia Registration UZJ-9489.  A

query with the Virginia Department of Motor Vehicles shows the BMW is registered to an

unindicted co-conspirator (UCC-2) a Hispanic male with a birth date of April 22, 1994, with a

listed address of 4463 Dale Boulevard Woodbridge, Virginia 22193.  The law enforcement

databases also showed that on June 7, 2018, UCC-2 was arrested for driving while intoxicated

in Leesburg, Virginia.  Additionally, UCC-2 has had numerous interactions with law

enforcement.  During some of these interactions, UCC-2 provided the phone number of 571-

363-5055 to law enforcement.

37.      Law enforcement served administrative subpoenas on MEJIA BENITEZ's

number and the number used by UCC-2 requesting subscriber information and call detail

records.  The records showed that the number used by UCC-2 was registered to Moran's

Refrigeration Service of Alexandria, Virginia.  It should be noted that in previous encounters

with law enforcement, UCC-2 has identified that he is employed by Moran's Refrigeration

Service. In June 2018, UCC-2 was in an accident in Washington, D.C., operating a vehicle owned by Moran's Refrigeration Service.

38.     Toll analysis on the call detail records was also conducted on records provided by the administrative subpoena. The analysis showed that the phone number used by UCC-2 was a frequent contact of MEJIA BENITEZ and has been throughout this investigation.

*Arrest of Peralta-Perez on June 23, 2018*

39.     On June 23, 2018, PERALTA-PEREZ was arrested by the Virginia State Police for driving while under the influence of alcohol. At the time of his arrest, PERALTA-PEREZ provided law enforcement with the name of Jose MEJIA LARA and a date of birth of February 2, 1975. After his arrest, a criminal history was run on Jose MEJIA LARA, a white Hispanic male with a date of birth of February 2, 1975, and a FBI number of 35753TA1. The criminal history revealed that Jose MEJIA LARA was an alias for Minor Adermi PERALTA-PEREZ, a Hispanic male with a date of birth of August 28, 1974. Law enforcement compared a photograph of Jose MEJIA LARA and Minor PERALTA-PEREZ and confirmed that they were the same person.

*CS-1 Controlled Purchase of Cocaine from Mejia Benitez on July 5, 2018*

40.     On July 5, 2018, CS-1 met with law enforcement to conduct a controlled purchase of cocaine from MEJIA BENITEZ. CS-1 had previously contacted ABARCA-CORVERA and arranged to purchase five ounces of cocaine from MEJIA BENITEZ. CS-1 and his vehicle were searched and found to be free of money and contraband. CS-1 was then provided with $6,500 in pre-recorded U.S. currency and audio recording and transmitting equipment. Prior to leaving the undisclosed location, CS-1 contacted ABARCA-CORVERA to confirm that the purchase was still on. She informed him that she was at work, but that he

should contact MEJIA BENITEZ directly and confirm with him. While on the phone with MEJIA BENITEZ, he explained to CS-1 that he currently only had an ounce of cocaine for sale. At the direction of law enforcement, CS-1 agreed to purchase the one ounce of cocaine from MEJIA BENITEZ.

41.     CS-1 was followed by law enforcement from the undisclosed location to the Larkin Drive property. After arriving, CS-1 was observed entering the residence through the front door. While CS-1 was inside, a dark-colored BMW bearing Virginia registration UZJ-9489 arrived at the residence and a Hispanic male, believed to be UCC-2, wearing a black shirt and his hair in a "bun" on the top of his head entered the residence. Surveillance units were shown an unidentified photograph of UCC-2 and confirmed that the subject who had arrived in the BMW and who had just entered the Larkin Drive property was UCC-2. While inside the residence, law enforcement monitored the conversations of the subjects inside Larkin Drive property.

42.     After a short period of time, CS-1 exited the residence and was followed back to an undisclosed location where he immediately provided law enforcement with approximately one ounce and 3.5 grams of cocaine and the remaining $5,020 in pre-recorded U.S. currency. CS-1 and his vehicle were searched again and found to free of money and contraband. CS-1 confirmed that he had purchased the cocaine directly from MEJIA BENITEZ. CS-1 said to law enforcement that MEJIA BENITEZ explained to him that his source of supply had just recently been arrested for driving while intoxicated and because of that he was "paranoid and laying low." CS-1 further explained that the Hispanic male, identified as UCC-2, also said that he had just recently been arrested for a DWI in Loudon County. MEJIA BENITEZ said that he has another source of supply in Washington, D.C.,

23

but his source was not willing to make a delivery of cocaine until the following day. MEJIA
BENITEZ told CS-1 that if he wanted, he could contact him in the morning and they would
make arrangements to purchase the remaining four ounces of cocaine. The details of this
conversation were confirmed by law enforcement by the recording equipment worn by CS-1.
A small portion of the cocaine was field tested and the results were positive for the presence
of cocaine. The cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing,
storage, and safekeeping. The laboratory results indicated that the net weight contained
approximately 31.36 grams of cocaine hydrochloride.

*CS-1 Controlled Purchase of Cocaine from Mejia Benitez on July 6, 2018*

43.     On July 6, 2018, at the direction of law enforcement, CS-1 contacted MEJIA
BENITEZ to conduct a purchase of the remaining four ounces of cocaine from the controlled
purchase the day prior. CS-1 met with law enforcement at an undisclosed location, where he
and his vehicle were searched and found to be free of money and contraband. CS-1 was then
provided with $5,020 in pre-recorded U.S. currency and audio recording and transmitting
devices. Prior to CS-1's departure, law enforcement established surveillance in the area of the
SUBJECT PRRMISES. CS-1 departed the undisclosed location and was followed to the
Larkin Drive property. After arriving, CS-1 entered the residence where he could be heard
talking to MEJIA BENITEZ. At approximately 6:12 PM, surveillance units observed the
dark-colored BMW, with Virginia Registration UZJ-9489, turning down Larkin Drive and
parking near the Larkin Drive property. Two minutes later, the dark-colored BMW was seen
driving away from the Larkin Drive property with surveillance units following. Law
enforcement was able to positively identify the driver of the dark-colored BMW as UCC-2.

24

44.     Shortly after the UCC-2 left, CS-1 exited the residence and was followed by law enforcement to an undisclosed location where he immediately provided law enforcement with approximately four ounces of suspected cocaine, $20 in unspent pre-recorded U.S. currency, and the audio recording and transmitting devices. CS-1 and his vehicle were searched and found to be free of money and contraband. CS-1 explained that shortly after he arrived, MEJIA BEINTEZ made a phone call to his source asking for five ounces of cocaine. MEJIA BEINTEZ then explained that his source would be arriving in approximately 25 minutes. Approximately 20 minutes later, MEJIA BENITEZ said his source was close and he requested the money from CS-1. After counting the money, MEJIA BENITEZ told CS-1 he would be right back and left leaving CS-1 inside the Larkin Drive property. Approximately three minutes later, MEJIA BEINITEZ returned with a bag containing approximately five ounces of cocaine. MEJIA BENITEZ weighed out one ounce for himself and gave the remaining four ounces to CS-1. A small portion of the suspected cocaine was field tested and the results were positive for the presence of cocaine. The cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and safekeeping. The laboratory results indicated that the net weight contained approximately 111.49 grams of cocaine hydrochloride.

45.     While CS-1 was being debriefed, surveillance continued to follow UCC-2 in the dark-colored BMW. UCC-2 was followed from the Larkin Drive property to a shopping center in Woodbridge, Virginia. Surveillance units briefly lost sight of UCC-2, as he entered a store in the shopping center. A short time later, UCC-2 was observed entering the BMW and exiting the parking lot. UCC-2 was followed as he traveled from the shopping center and drove directly to the Dale Boulevard property, where he parked on the street in front of the

residence. UCC-2 was observed exiting the vehicle and entering the front door of the Dale
Boulevard property using a key.

46.    After the controlled purchase, law enforcement reviewed the audio recording
of the controlled purchase. At approximately 5:37 PM, MEJIA BENITEZ could be heard
talking on the phone asking his source to bring him 5, referring to the five ounces of cocaine
hydrochloride. After the making the phone call, MEJIA BENITEZ explained to CS-1 that his
source would be there in approximately 25 minutes. At approximately 5:58 PM, MEJIA
BEINTEZ was heard asking the CS for the money, stating his source would be arriving in
seven minutes. At approximately 6:09 PM, MEJIA BENITEZ told CS-1 he needed to step
outside for two minutes. At approximately 6:13 PM, MEJIA BENITEZ's voice could be
heard back inside the house.

47.    Law enforcement served an administrative subpoena on the phone number
used by MEJIA BENITEZ, requesting call detail records. An analysis of the call detail
records confirmed that at 5:37 PM, MEJIA BENITEZ made an outgoing phone call to UCC-
2, on 571-363-5055. The phone call was one minute and 10 seconds in length and the time of
the call matched the time stamp provided on the audio recording equipment worn by CS-1
during the controlled purchase.

48.    After the controlled purchases, CS-1 was shown an unidentified photograph of
UCC-2. CS-1 confirmed that UCC-2 was the subject who was inside the Larkin Drive
property on July 5th and was the same individual said that he had recently been arrested for
DWI in Loudon County. CS-1 further said that he believed that UCC-2 was MEJIA
BENITZ'S source of supply and he believed that UCC-2 had just dropped off the cocaine to
MEJIA BEINTEZ.

49.     After the controlled purchase, law enforcement served an administrative

subpoena on the phone number used by MEJIA BENITEZ, requesting call detail records. An

analysis of the call detail records confirmed that MEJIA BENITEZ spoken to UCC-2, on 571-

363-5055, just prior to him arriving at the Larkin Drive property on July 6, 2018. Toll records

show more than 1,200 calls between MEJIA BENITEZ and UCC-2 during the period June

2017 to August 2018.

50.     In early August 2018, CS-1 contacted MEJIA BENITEZ to arrange the

purchase of two ounces of cocaine. On August 13, 2018, MEJIA BENITEZ informed CS-1

that he will have the two ounces available the following day (August 14, 2018). MEJIA

BENITEZ told CS-1 that this cocaine will be coming from "a new guy" and that it would cost

$100 more than the prior transactions.   CS-1 confirmed that the amount and price of the

cocaine was acceptable.

51.     On August 14, 2018, The Honorable Michael S. Nachmanoff issued a search

warrant for the premises at 17235 Larkin Drive Dumfries, Virginia 22026 in conjunction with

the ongoing investigation of MEJIA BENITEZ.

52.     Later in the evening on August 14, 2018, CS-1 met with law enforcement to

conduct a controlled purchase of cocaine from MEJIA BENITEZ. CS-1 and his vehicle were

searched and found to be free of money and contraband. CS-1 was then provided with $2,550

in pre-recorded U.S. currency and audio recording and transmitting equipment. At

approximately 6:57 p.m., CS-1 entered the Larkin Drive property and purchased 2 ounces of

cocaine from MEJIA BENITEZ. The CS-1 asked MEJIA BENITEZ for an additional

quantity of cocaine. MEJIA stated he could provide additional cocaine after meeting with his

source of supply later in the evening.   After a short period of time, CS-1 exited the residence

and was followed back to an undisclosed location where he immediately provided law enforcement with approximately 2 ounces of cocaine. CS-1 and his vehicle were searched again and found to free of money and contraband. CS-1 confirmed that he had purchased the cocaine directly from MEJIA BENITEZ. The submission of the cocaine is pending to the DEA Mid-Atlantic Laboratory.

53.     On August 14, 2018 at approximately 8:40 p.m., the search warrant was executed at the Larkin Drive property. Law enforcement arrested MEJIA BENITEZ during the execution of this search warrant. The $2,550 USC of evidentiary buy funds were recovered from Mejia Benitez's bedroom. Also recovered from the bedroom was additional cocaine, packaging supplies, a digital scale, a Smith and Wesson handgun, and a hand written ledger believed to be a pay-owe sheet. MEJIA BENITEZ signed a DEA-13 Advice of rights form and agreed to talk to investigators and among other things stated he is a seller of cocaine and obtains his cocaine from his primary source of supply who is located in the District of Columbia. MEJIA BENITEZ also stated he has received cocaine from UCC-2 in the past, which he resells for profit.

## CONCLUSION

Based on the facts outlined above, there is probable cause to believe that from in and around June 2017, through on or about August 14, 2018, within the Eastern District of Virginia and elsewhere, MYNOR ALEXANDER MEJIA BENITEZ, a/k/a "Mynor Alexander Mejia," and MINOR ADERMI PERALTA-PEREz, a/k/a "Amilcar Lara," a/k/a "Jose Mejia Lara," knowingly and intentionally combined, conspired, confederated, and agreed with others, known

and unknown, to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.


Richard G. O'Donnell
Task Force Officer
Drug Enforcement Administration


Sworn and subscribed to before me this ___ day of August 2018.


_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge
The Honorable Michael S. Nachmanoff
United States Magistrate Judge

29